DWYER, District Judge:
I. INTRODUCTION
In these consolidated appeals from orders of the Ninth Circuit Bankruptcy Appellate Panel (“BAP”),[2] we must decide whether the United States Bankruptcy Court for the Southern District of California erred in determining that certain payments made to two of the debtor’s suppliers were avoidable under 11 U.S.C. § 547(b) as preferential transfers. The bankruptcy court ruled that the ordinary course of business exception, under 11 U.S.C. § 547(c)(2), did not apply as a matter of law to debt restructuring agreements, and granted partial summary judgment on that basis. The BAP disagreed, holding that the issue of whether payments under a restructuring agreement are made in the ordinary course of business is a question of fact that depends on the parties’ dealings and industry practice. The BAP nevertheless affirmed the partial summary judgment rulings on the basis that the evidence of record failed to raise a triable issue. We hold that the evidence was sufficient to create genuine issues of material fact as to whether the challenged payments qualified under the ordinary course of business exception, and therefore reverse and remand for a trial on that issue. In all other respects — the use of a fact-dependent test, the sufficiency of the evidence to show the debtor’s insolvency, and the propriety of the bankruptcy court’s having granted a motion for reconsideration on the statute of limitations issue — we affirm the BAP’s rulings.
II. BACKGROUND
Kaypro Corporation (“Kaypro”), the debtor, was a manufacturer of personal computers and precision instruments. Arrow Electronics, Inc. (“Arrow”) and Schweber Electronics Corporation (“Schweber”) supplied electronic parts and components to Kaypro. Arrow is Schwe-ber’s successor-in-interest.
In March 1989, when Kaypro owed Schweber $227,837.96, the parties restructured the debt. Kaypro executed a promissory note requiring monthly payments of about $15,000, and Andrew Kay, Kaypro’s president, personally guaranteed the note. Between April and August 1989, Kaypro made five payments as required by the note, although the payments were between nine and sixteen days late. Kaypro also made a number of payments after September 1, 1989.
Aso in March 1989, Kaypro and Arow restructured a $117,290.06 past due debt by means of a personally guaranteed promissory note. That note required monthly payments to Arow of $9,774.17. Between March and August 1989, Kaypro made six payments, between ten and twenty-eight days late, under the note.
Kaypro restructured its debts with other creditors at about the same time, but failed to recoup its fortunes and filed for bankruptcy protection on March 1, 1990. The Chapter 11 proceeding was converted to a Chapter 7 liquidation in June 1992.
In the fall of 1993, Howard Justus, Kay-pro’s trustee in bankruptcy, sued Arrow and Schweber to avoid alleged preferential transfers. Ml parties moved for summary judgment. The bankruptcy court awarded partial summary judgments to the trustee, determining that Kaypro’s payments to the two creditors were not made in the ordinary course of business. A trial was held on the insolvency issue, and the court *1073 found that Kaypro was insolvent at least as of March 1, 1989. In light of then-new Ninth Circuit authority, the court granted a motion to reconsider an earlier ruling that the trustee’s complaints were barred by the statute of limitations. Judgments were entered for the trustee in the amounts of $58,645.02 against Arrow and $98,519.26 against Schweber. Arrow, as to its own transactions and as Schweber’s successor, has timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 158(d).
III. STANDARDS OF REVIEW
This court reviews decisions of the BAP de novo, and thus reviews the bankruptcy court’s decisions under the same standards used by the BAP. See In re Vasseli 5 F.3d 351, 352 (9th Cir.1993). The rulings on the parties’ motions for partial summary judgment are reviewed de novo. See In re Bakersfield Westar Ambulance, Inc., 123 F.3d 1243, 1245 (9th Cir.1997). Findings of fact, such as the finding of insolvency, are- reviewed for clear error. See In re Parker, 139 F.3d 668, 670 (9th Cir.1998). Whether the bankruptcy court properly considered and granted the trustee’s motion for reconsideration is reviewed for an abuse of discretion. Cf. In re Pintlar Corp., 133 F.3d 1141, 1145 (9th Cir.1997) (lower court exercises discretion in deciding whether to apply amended rule to pending matter).
IV. THE ORDINARY COURSE OF BUSINESS EXCEPTION
Summary judgment may be ordered only if the record shows that “there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). The evidence, and all reasonable inferences therefrom, must be viewed- in the light most favorable to the non-moving party. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass’n, 809 F.2d 626, 630-31 (9th Cir.1987).
To avoid a transfer under 11 U.S.C. § 547(b), the trustee must prove by a preponderance that the transfer was (1) made to or for the benefit of a creditor, (2) on account of an antecedent debt, (3) made while the debtor was insolvent, and (4) made within one year of the petition, and (5) enabled the creditor to receive more than it would have had the transfer not been made and the case liquidated pursuant to the provisions of chapter 7 of the bankruptcy code. Id. If, however, the creditor proves that the transfer was “(A) in payment of a debt incurred by the debt- or in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms,” the transfer may not be avoided. 11 U.S.C. § 547(c)(2). This is commonly referred to as the ordinary course of business exception.[3]
We agree with the BAP that the bankruptcy court erred in holding that payments made pursuant to a restructuring agreement are per se outside the ordinary course of business category. The better rule, as the BAP stated, is that “such determination is a question of fact that depends on the nature of industry practice.” Kaypro, 230 B.R. at 406. The Second Circuit has explained why in In re Roblin Industries, Inc., 78 F.3d 30 (2d Cir.1996):
It is not difficult to imagine circumstances where frequent debt rescheduling is ordinary and usual practice within an industry, and creditors operating in such an environment should have the same opportunity to assert the ordinary course of business exception. See, e.g., *1074 [In re] U.S.A. Inns, 9 F.3d [680,] 685 [8th Cir.1993] (regular practice in savings and loan industry to adopt payment plans for delinquent customers); Armstrong v. John Deere Co. (In re Gilbertson), 90 B.R. 1006, 1012 (Bankr.D.N.D.1988) (deferral agreements common in retail farm implement sales industry). Indeed, if the industry practice is to restructure defaulted debt, it would make little practical sense to require creditors to comply with any other standard in order to meet the requirement of § 547(c)(2)(C).
Id. at 42. The ordinary course of business exception, the Second Circuit noted,
benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress while at the same time affording a measure of flexibility to creditors in dealing with the debtor, provided that the steps taken are consistent with customary practice among industry participants.
Id. at 41.
Thus, to apply Section 547(c)(2)(C), the court must look to “those terms employed by similarly situated debtors and creditors facing the same or similar problems. If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry.” Id. at 42. The determination requires “a factual inquiry that is appropriately left to the bankruptcy court.” Id. at 41.[4]
Here, after holding that the ordinary course of business exception requires fact-specific analysis, and that the bankruptcy court had erred in ruling otherwise, the BAP nevertheless affirmed the partial summary judgment rulings because “the record is devoid of any competent evidence as to whether restructuring agreements and personal guarantees were utilized within the industry in the ordinary course of business,” and because the debtor “deviated from its customary business practice by executing the promissory note[s] and making monthly payments.” Kaypro, 230 B.R. at 407. Our de novo review of the record leads us to a different conclusion.
The relevant evidence came chiefly from Peter Griesbach, Arrow’s credit manager, and Andrew Kay, the principal of Kaypro. Griesbach stated in a declaration (emphasis added):
As part of its ordinary course of business, ARROW routinely enters into workout or debt restructuring agreements with creditors who are unable to meet their obligations. As part of a debt restructuring agreement, ARROW routinely requires the creditor to consolidate its outstanding debt and execute a Promissory Note promising to repay ARROW the consolidated debt, in monthly installments. These types of agreements are common in the industry and are routinely used by ARROW. Often, in the ordinary course of ARROW’S business, ARROW would require security for a promissory note in various forms, including, but not limited to, asset liens, personal guaranties [sic] and purchase money security agreements. When personal guarantees are employed, the guarantees are executed at the same time the Promissory Note is executed by the corporation. Said restructuring agreements are normally used in the ordinary course of ARROW’S business.
Kay testified by deposition (emphasis added):
Q. Mr. Kay, how long have you been in the electronics industry?
*1075 A. Depending how it’s defined, 40 or 50 years.
Q. And you’ve been running a company during that time as well?
A. No, I started my own company in 1952.
Q. In your opinion, do vendors generally require personal guarantees and promissory notes for debts incurred by a company that they sell product to when there’s a risk that the company might not pay the debt?
A. I don’t know how it is with other people, but I had been asked for it many times.
Q. Would you consider that an ordinary requirement by your vendors, to ask you to sign promissory notes and personal guarantees, from your experience?
A. Sometimes it is.
Q. So back in, I guess, 1988,1989 when they were requesting you to sign these, that didn’t seem out of the ordinary for you.
A. No.
Q. And so part of the or the reason why you did this [sign a- personal guarantee or promissory note for outstanding debt] in order to keep your credit going with these certain entities is so that you could continue to buy products; is that right?
A. Yes.
Q. And then that is when they required you, in order to keep buying, purchasing products—

A. Yeah.

Q. —that you tvere to sign a personal guarantee or promissory note.
A. Yes.
Q. Is that something that’s in the ordinary course, in your opinion, of what went on in the industry?
A. No. I very specifically tried to avoid saying what was going on in the industry because I didn’t know. All I know is what happened to me.
Q. But that was in the ordinary course of how you were operating?
A. That’s right.
The BAP gave Griesbach’s testimony no weight because it was a “self-serving declaration [which] provided no foundation establishing his personal knowledge or experience in the industry.” Kaypro, 230 B.R. at 407. But the “self-serving” nature of the testimony would not disqualify it under Fed.R.Civ.P. 56(e), and the foundation was adequate. Griesbach had held his position for five years before the declaration was signed. He stated: “I am the credit manager of ARROW.... I have personal knowledge of the following facts, and ... I could and would competently testify thereto.” Personal knowledge may be inferred from a declarant’s position. See Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 206 F.3d 1322, 1330 (9th Cir.2000) (“As a corporate officer of SRF, Ananda Mata could be expected to know the identity of SRF employees and their tasks.”); Barthelemy v. Air Line Pilots Ass’n, 897 F.2d 999, 1018 (9th Cir.1990) (CEO’s personal knowledge of various corporate activities could be presumed). Griesbach’s five-year tenure as Arrow’s credit manager lends support to his claim of “personal knowledge” of industry practice. Kay’s testimony about his own firm’s business practices was clearly based on personal knowledge and can be read to mean that the restructuring agreements with Arrow and Schweber comported with the debtor’s ordinary methods of doing business.
The trustee argues that other factors— unusual collection efforts by the two creditors, lateness of payments under the notes, and an inadequate showing of a continuing business relationship with the debtor— place these transfers outside the ordinary course of business. Arrow contends that these arguments were not raised in the bankruptcy court and are waived. We need not decide the waiver question because these assertions by the trustee merely list factors to be considered on *1076 remand; they do not justify an award of summary judgment.
The BAP rejected Arrow’s argument that a genuine issue of material fact was present for the additional reason that Arrow had not made that contention in bankruptcy court, but had argued only that the evidence in the record “is enough to resolve the entire case.” Kaypro, 230 B.R. at 408 (internal quotations omitted). “The Panel,” it held, “may only review matters that were properly raised and decided by the bankruptcy court.” Id. But the long-established rule is that when opposing parties move for summary judgment, each seeking judgment in its favor, neither is barred from contending later that issues of material fact precluded the entry of summary judgment against it. See Hotel del Coronado Corp. v. Foodservice Equip. Distribs. Ass’n, 783 F.2d 1323, 1325 n. 1 (9th Cir.1986). Arrow was not required to state explicitly a fallback position that was implicit in its motion papers, and it did not waive its right to argue that genuine issues of material fact precluded summary judgment for the trustee.
Whether the evidence was, or should be, sufficient to persuade the trier of fact is not before us. The record, when viewed most favorably to the non-moving parties as Rule 56 requires, raises genuine issues of material fact for trial as to the disputed Section 547(c)(2) elements, and neither side was entitled to summary judgment. Accordingly, on remand those issues will be for trial.
V. SUFFICIENCY OF THE EVIDENCE AS TO INSOLVENCY
All other elements of Section 547(b) having been resolved by summary judgment in the trustee’s favor, the bankruptcy court conducted a trial as to the insolvency issue, and found that Kaypro was insolvent at the time of the contested transfers (March 1, 1989 to August 30, 1989). Arrow contends that this finding constituted clear error.
To prove insolvency, the trustee must show by a preponderance of the evidence that the debtor’s liabilities exceeded its assets. See In re Koubourlis, 869 F.2d 1319, 1321 (9th Cir.1989). See also 11 U.S.C. § 101(32)(A) (defining insolvency as a “financial condition such that the sum of [the debtor’s] debts is greater than all of [its] property, at a fair valuation” exclusive of certain exempted or fraudulently transferred property).
There is no generally accepted accounting principle for analyzing the insolvency of a company. See Sierra Steel, Inc. v. Totten Tubes, Inc., 96 B.R. 275, 278 (9th Cir. BAP 1989). The evidence presented at trial consisted of (1) an audited September 1988 annual financial report which showed a valuation of approximately $3.2 million; (2) three subsequent 10-Q statements indicating that the company’s assets were greater than its liabilities; (3) an audited September 1989 annual financial report[5] showing an approximate valuation of negative $16.2 million; (4) 10-Q statements and annual reports from prior years showing that Kaypro routinely understated its inventory mid-year; and (5) the testimony of two experts called by the parties. No additional financial information was presented because the remainder of Kay-pro’s books and records were destroyed before the trustee was appointed.
The experts agreed that at least by September 1, 1989, the date of the last audited financial report, Kaypro was insolvent. The trustee’s expert, David Marston, conceded that, given the paucity of financial information, he could not determine exactly when insolvency had begun. However, in light of the historic inventory patterns Marston concluded that the decline in Kay-pro’s net worth of about $19.5 million between September 1988 and September 1989 probably occurred throughout the fis *1077 cal year. Marston allocated the decline through the year using three alternative methods: straight-line, cost of sales, and sales. These methods resulted in an insolvency range of $1.5 million to $7.7 million as of March 1,1989.
The creditors’ expert, Lester Schwartz, described Marston’s methods as' “imaginative” and “based on mere speculation.” He opined that absent source documentation and a market analysis, it was impossible to determine either the cause or the time of the loss in inventory value, and that it was “plausible that the write-down items contained in Marston’s report, including inventory, occurred in the fourth quarter of 1989.” Schwartz added, however, that he did not “have any reason to believe [Kaypro’s $19 million decline] was not throughout the year.”
While it may have been “plausible” that the adjustments were correctly booked in the fourth quarter, the evidence supported a finding that the loss of value occurred throughout the fiscal year. The methods used to apportion the decline were reasonable, and each method resulted in a showing of insolvency by March 1, 1989. The bankruptcy court’s finding of insolvency as of that date was not clear error.
YI. MOTION FOR RECONSIDERATION
On December 20, 1995, the bankruptcy court dismissed the case on statute of limitations grounds based on In re IRFM, Inc., 65 F.3d 778 (9th Cir.1995). On December 29, 1995, the Ninth Circuit clarified its holding in IRFM in In re Hanna, 72 F.3d 114 (9th Cir.1995), which, the parties agree, foreclosed the statute of limitations defense in this case. The trustee moved for reconsideration of the dismissal under Fed.R.Civ.P. 59(e),[6] serving his motion on January 2, 1996, and filing it on January 3, 1996. Until December 1, 1995, Rule 59(e) required service within ten days of the order of dismissal. The rule was amended, however, to provide that, as of December 1, 1995, filing of the motion was required within ten days. In this case, the tenth, day was January 2, 1996, making the motion timely under the old rule but untimely under the new. Arrow contends that the motion was untimely and that the bankruptcy court therefore lacked jurisdiction to grant it. See Fed. R.Civ.P. 6(b). See also Scott v. Younger, 739 F.2d 1464, 1467 (9th Cir.1984) (time period specified in Rule 59 “is jurisdictional and cannot be extended by the court”).
The 1995 amendment to the Rule was made effective pursuant to an Order of the Supreme Court which stated in part: “That the foregoing amendments ... shall govern all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings in civil cases then pending.” April 27, 1995, Order Adopting and Amending Rules, reprinted in Federal Civil Judicial Procedure and Rules 34 (West 2000). This case was pending on the effective date of the amended rule. Therefore, the amendment governs “insofar as just and practicable.” The bankruptcy court found that it would be “entirely unfair” to apply the amended rule when the trustee served his motion on the first day that he could (given the intervening holiday and weekend) and filed it the next day — in other words, that application of the new rule would not be “just.” There was no prejudice to any opposing party. The BAP held that “[t]he bankruptcy court did not abuse its discretion in refusing to apply the amended version of Rule 59(e).” Kaypro, 230 B.R. at 411. We agree.
VII. . CONCLUSION
For the reasons stated, the orders granting partial summary judgment on the ordinary course of business exception under 11 U.S.C. § 547(c)'are reversed, and these cases are remanded to the bankrupt *1078 cy court for trial of that issue. In all other respects, the BAP’s rulings are affirmed.
AFFIRMED IN PART, REVERSED IN PART, and REMANDED. Each party shall bear its own costs on appeal.

. The BAP order in No. 99-55206 is published as In re Kaypro, 230 B.R. 400 (9th Cir. BAP 1999). The BAP entered a virtually identical unpublished order in No. 99-55210.

. The exception "deter[s] the ‘race to the courthouse’ and enabl[es] the struggling debt- or to continue operating its business.” Union Bank v. Wolas, 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). See also H.R.Rep. No. 95-595, 95th Cong. 2nd at p. 373, 1978 U.S.Code Cong. & Admin.News pp. 5963, 6329 (1977) (the exception was intended to "leave undisturbed normal financial relations”).

. Generally in accord with Roblin are In re Healthco Int’l, Inc., 132 F.3d 104, 109-10 (1st Cir.1997) and In re Magic Circle, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986) ("The mere restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances.”). An opposing view is stated or implied in Clark v. Balcor Real Estate Finance, Inc., 12 F.3d 1549, 1554 (10th Cir.1993) (not normal financing relationship where “creditors in the industry use such an arrangement only in extraordinary circumstances, when debtors are in trouble”).

. Fed. R. Bankr.P. 9023 integrates Fed. R.Civ.P. 59 into the rules of bankruptcy procedure.